WILSON, Circuit Judge,
Concurring in the Denial of Rehearing En Banc:
I respectfully write a brief response to my colleagues who have dissented from the denial of rehearing en banc.
This was a qualified immunity case. The opinion[1] concludes that Rayfield Alfred, Fire Chief for the Consolidated City of Jacksonville, Florida, was entitled to qualified immunity when he postponed creating four new captain positions, based allegedly on the premise that the next available candidates on the eligibility list were white males. At the time, eight consecutive white males had previously been promoted. Alfred, an African-American, was newly appointed by Jacksonville’s mayor from outside the department, in an effort to address the department’s prior *1299 reputation for nepotism and racism. Although Alfred had discretion over whether to fill vacancies, he also had authority to create new positions within the Department. According to the testimony of a number of witnesses, Alfred delayed the creation of new positions in an effort to obtain a more diverse applicant pool, a pool that would also have included the plaintiffs. His decision resulted in plaintiffs’ complaint pursuant to 42 U.S.C. § 1983 inter alia.
First, I agree with Judge Tjoflat that Fire Chief Alfred’s conduct in Williams violated the constitutional rights of the plaintiffs. While the opinion recognizes that the action taken in this case was significantly different from the type of discriminatory conduct our Circuit has previously found unlawful, the opinion states unequivocally that a decision not to create new jobs, based solely on the race and gender of the next eligible applicants, in the absence of an affirmative action plan, violates the Equal Protection Clause. See Williams v. Consol. City of Jacksonville, 341 F.3d at 1269. If Alfred committed similar conduct today, he would be held responsible. Where I disagree with the dissenters, however, is whether clearly established law had placed Alfred on notice of this misconduct so as to strip him of his entitlement to qualified immunity.
No Eleventh Circuit or Supreme Court authority would have established to Chief Alfred that he could not hold up on creating new jobs until there was a more diverse applicant pool. We were unable to determine that the “contours of [the] right [were so clearly established] that a reasonable official would have understood his acts were unlawful.” Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir.1993). “If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.” Id. Our Circuit has repeatedly stated that qualified immunity provides complete protection for public officials from liability in their individual capacities except “all but the plainly incompetent or one who is knowingly violating federal law.” Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir.2001). “That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against the claims made against them in their individual capacities.” Lassiter v. Alabama A & M Univ. Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir.1994) (en banc).
Our decision in Yeldell v. Cooper Green Hosp., Inc., 956 F.2d 1056 (11th Cir.1992), upon which the dissenters primarily hang their hats, is unavailing. Yeldell involved the actual hiring and firing for an existing job. Karan Cremer, a plaintiff in Yeldell, was removed from her job and replaced by a person of another race. Yeldell could not possibly have “clearly established” the impropriety of the conduct in the present case. Here, no job was ever created in the first instance. In fact, (1) no final decision had even been made as to whether the new positions would ever be created at all, and (2) if and when the positions were created, the new vacancies would be filled through a race-neutral hiring procedure, to which plaintiffs did not object, and in which they would have been permitted to compete.
Judge Tjoflat argues in dissent that the major point of difference between Yeldell and Williams — the fact that in Yeldell, Cremer was permitted to serve in the position on a “temporary” basis, — is not sufficient “to remove Alfred’s decision from the realm of Yeldell.” Tjoflat dissent at 1305. However, the simple truth is that in Yel-dell, regardless of the hospital’s nomenclature regarding the position, Cremer held the position of nursing supervisor at the time the unlawful employment decision *1300 was made. She was, as far as we know, engaged in every function of the eventual permanent position. This simply was not the case in Williams.
Here, all that can be said of Chief Alfred is that he decided not to create severally entirely new supervisory positions, a situation that is factually quite distinct from one in which an individual is terminated or removed from his or her position solely on the basis of race. The plaintiffs in Williams did not apply for existing captain’s positions, and then see those jobs go to individuals of another race. Moreover, the plaintiffs were not serving in the positions before being terminated and replaced on account of race, as was the case in Yeldell. No position was ever created that could be filled by an individual of any race, let alone someone of a different race. No matter how much the facts of Yeldell are stretched, the case simply did not presage the situation presented here.
The dissenters’ reliance upon Smith v. Lomax, 45 F.3d 402 (11th Cir.1995) is equally unavailing. In Lomax, the Board of County Commissioners of Fulton County, Georgia, voted to replace its white female clerk with an African-American female, at the conclusion of her six-year term. See id. at 403. Two African-American board members voted not to replace the clerk, allegedly on the basis of race. See id. The dissenters rely on Lomax as an expression of the general prohibition of racial discrimination in public employment. However, in spite of whatever general principles Lomax states, it narrowly and clearly frames its actual issue in terms of whether, at the time the commissioners cast their votes to terminate and replace the plaintiff, that particular action violated the plaintiffs constitutional rights. See id. at 407 (“[T]he question we must answer is whether at the time appellants exercised the discretionary function of casting their votes ... their conduct violated a clearly established constitutional right of which a reasonable person would have known.”) (quotation marks and citation omitted). Again, Lomax, like Yeldell, dealt with a race-based termination from and filling of an existing job, and it was filled by someone of another race. There is no dispute that the type of action prohibited in Lo-max — racially-motivated discharge — had previously been established in our case law. See Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1478 (11th Cir.1991).
In sum, no case existed in 1999 that clearly established the unconstitutionality of the ■ conduct in Williams. Until Williams, we had not yet dealt with a situation in which a decision-maker opted not to create entirely new jobs on the basis of race. In fact, as far as I am able to determine, no Circuit has to date. In addition, in Williams, the parties never even reached the point where an actual employment decision as to hiring or firing could have been made; the captain positions simply had not been created. Eleventh Circuit case law in no way previously had proscribed such conduct. Thus, while I agree fully with Judge Tjoflat that Alfred’s conduct was unconstitutional, it certainly had not been clearly established as unconstitutional at the time in question. Consequently, en banc review was unnecessary.

. Williams v. Consol. City of Jacksonville, 341 F.3d 1261 (11th Cir.2003).